NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0308n.06

No. 17-1875

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 21, 2018
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| SHANNAN MCDONALD, | ) |
| | ) |
| Plaintiff - Appellant, | ) |
| | ) |
| v. | ) ON APPEAL FROM THE UNITED |
| | ) STATES DISTRICT COURT FOR |
| | ) THE EASTERN DISTRICT OF |
| UAW-GM CENTER FOR HUMAN | ) MICHIGAN |
| RESOURCES, | ) |
| | ) OPINION |
| Defendant - Appellee. | ) |

BEFORE: GIBBONS, STRANCH, and BUSH, Circuit Judges.

**JOHN K. BUSH, Circuit Judge.** Many Americans exercise. The go-getters work out before the sun rises. Others purge work stress with some evening calisthenics. Only the lucky few have the time and opportunity to exercise during their lunch break. Shannan McDonald was one: her employer provided an on-site gym. But McDonald asked for an extended lunch break to exercise even longer. Before hearing back from her employer, she quit. She later sued her employer under the Americans with Disabilities Act ("ADA"), alleging discrimination for failing to accommodate her disability and that her employer retaliated against her for making the request. McDonald also claims she was constructively discharged. The district court granted summary judgment in favor of her employer. We affirm.

**I**

McDonald worked as a receptionist for UAW-GM Center for Human Resources ("CHR") for ten years. She was born with Crouzon syndrome, a genetic disorder. This condition prompted her to undergo multiple surgeries over the years. For each of these surgeries, CHR granted her time away from work.

McDonald was a member of a union, and a collective bargaining agreement ("CBA") covered her employment. The CBA gave CHR authority over work rules and employee schedules. During a designated period each year, CHR allowed employees to select a thirty- or sixty-minute lunch break to be in effect for the remainder of the year. If a thirty-minute break was selected, the employee also was allowed two fifteen-minute breaks, but "under normal circumstances" those breaks were not to be tacked on to the lunch break. McDonald selected a thirty-minute lunch break, which could not begin until 11:00 a.m.

McDonald exercised in CHR's on-site gym during her lunch break "[a]ll the time." In February 2014, without authorization, she began heading for the gym at approximately 10:30 a.m. to give herself an extended lunch break. She exercised with a co-worker named Frank Moultrie.

McDonald worked on the first floor of CHR's building, but she often went up to the second floor to chat with Moultrie, where he worked. They would usually discuss their workout plans. These forays to the second floor caused trouble. However unfairly, rumors spread through CHR about an affair between McDonald and Moultrie. Second-floor employees told McDonald to stay off their floor and to stop exercising with Moultrie. They also called her derogatory names regarding her rumored relationship with Moultrie and the way she dressed. Three second-floor employees filed complaints against McDonald. And a second-floor supervisor complained to management about McDonald's purportedly disruptive trips there. McDonald countered with her

own complaint about the way second-floor employees treated her. But she also had trouble with the sixth floor; a worker there, John Ashton, filed a sexual harassment complaint against her, alleging that McDonald made him feel uncomfortable because she was following him around, looking for him, and texting him.

McDonald's immediate supervisor, Dottie Barnett, met with McDonald about these events. She discussed McDonald's conduct towards Ashton. She also discussed McDonald's complaints about the second-floor employees' actions, but McDonald refused to offer her names of specific co-workers. Ultimately, McDonald was told by Barnett and Chris Gallagher, UAW's personnel manager, to stay off the second floor.

On June 3 and June 5, 2014, McDonald emailed Barnett "to ask a favor" even though she "already kn[e]w what the answer [was] going to be." McDonald asked to extend her lunch break to sixty minutes or to tack on a separate ten-minute break so that she could work out longer at the on-site gym. Though she explained that she started exercising two years ago to help with pain from a previous surgery, she did not mention her disability or any need to work out longer at mid-day to help her perform her job. Anticipating the logical question of why she could not exercise after work, McDonald stated that her physical therapy appointments prevented it.[1]

On June 6, 2014, after discussing the matter with management, Barnett denied McDonald's request to change her lunch break or tack on a break to it, explaining that "it [was] not feasible" given the policy of lunch breaks remaining in effect for a year. Barnett reiterated that McDonald's lunch break did not start at 10:30 a.m. and warned McDonald that failure to follow the policy on breaks and lunch could result in disciplinary action. Barnett, though, offered an alternative proposal to McDonald: she could arrive fifteen minutes earlier and work out in the morning before

---

[1] It turned out, however, that these appointments lasted only five days.

her shift started. This made sense because McDonald had mentioned in her e-mail that she arrived to work thirty minutes early. But this did not satisfy McDonald, because, in her words, she "would rather have been able to switch [her] lunch from a half hour to an hour."

Six days later, on June 12, 2014, McDonald went up the chain of command to Gallagher. She gave him a letter from her doctor stating: "Please allow [McDonald] to continue strengthening exercises daily for 30 to 60 minutes Monday through Friday." Gallagher responded that he would bring McDonald's request to the co-executive directors, Chris Owen and Scott Sanderford. Four days later, on the following Monday morning, McDonald asked Gallagher for a status update on her request. But her request needed approval from both co-executive directors, and Sanderford was out of the office. Gallagher told McDonald that although her request was still under consideration, "we think it's going to be okay." Later that same day, at 10:44 a.m., knowing that her request was not yet approved, McDonald headed to the gym. Barnett caught her and told her to go back to work. McDonald responded with profanity.

After this event, and after she had already warned McDonald that failure to comply with the break policy could result in discipline, Barnett recommended to Gallagher that McDonald be suspended. Barnett, Gallagher, Adams, McDonald, and McDonald's union steward met on June 18, 2014. After McDonald admitted to heading to the gym early and to her profane response to Barnett, McDonald was suspended for the rest of the day and the day after as well. But she never returned to work. She instead went on personal leave, and, on July 10, 2014, she resigned from CHR, writing:

> I Shannon McDonald am voluntarily terminating my position at the UAW GM Center for Human Resources. My termination date is as of July 10, 2014. This was my decision and again I am just voluntarily terminating/quitting my job at the UAW Gm Center for Human Resources.

McDonald then sued CHR under the ADA for discriminating against her based on her disability and for retaliation. She also sued CHR for constructive discharge. The district court granted CHR's motion for summary judgment and dismissed McDonald's claims. For the reasons that follow, we affirm the district court's granting summary judgment.

## II

We review a district court's granting summary judgment de novo. *Williams v. AT&T Mobility Servs., LLC*, 847 F.3d 384, 391 (6th Cir. 2017). Viewing the evidence in the light most favorable to the nonmoving party, *id.*, we must affirm the district court if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he non-moving party must present evidence upon which a reasonable jury could find in her favor." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Unsupported allegations are insufficient, Fed. R. Civ. P. 56(c)(1), as is a "'scintilla' of evidence in support of the non-moving party's position." *Tingle*, 692 F.3d at 529 (quoting *Anderson*, 477 U.S. at 251).

McDonald argues that CHR discriminated against her because of her disability in violation of the ADA by failing to provide her with a reasonable accommodation. She also argues that CHR retaliated against her for engaging in a protected activity under the ADA—requesting an accommodation—when it suspended her. And she alleges that she was constructively discharged, which she adds was another adverse employment action for purposes of her retaliation claim. We address each of these arguments and their shortcomings below.

*ADA Discrimination.* The ADA requires companies like CHR to make "reasonable accommodations to the known . . . limitations of an otherwise qualified individual with a disability" so long as that accommodation does not cause the company "undue hardship."

42 U.S.C. § 12112(b)(5)(A). Although the ADA does not define "reasonable accommodation," it does provide examples, such as, of relevance here, "job restructuring [and] part-time or modified work schedules." 42 U.S.C. § 12111(9)(B). But the ADA is not a "catchall" statute. *See Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). It "does not endow all disabled persons with a . . . job schedule . . . of their choosing." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 757 (6th Cir. 2015) (en banc).

McDonald must first establish a prima facie case of disability discrimination under the ADA based on CHR's alleged failure to accommodate her disability. *See Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). If she does, the burden shifts to CHR to articulate a nondiscriminatory reason for its actions, such as showing that her proposed accommodation would impose an undue burden on it. To establish a prima facie case, McDonald must show that "(1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) [CHR] knew or had reason to know about her disability; (4) she requested an accommodation; and (5) [CHR] failed to provide the necessary accommodation." *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018) (citations omitted); *see Talley*, 542 F.3d at 1105. Her claim fails on this last prong: she cannot show that CHR failed to provide her with the *necessary* accommodation. That is, the evidence she provided at summary judgment is insufficient to show that the accommodation requested—a longer lunch break—was necessary to accommodate her.

In *Obnamia v. Shinseki*, we affirmed the district court's holding that the plaintiff could not show her request was reasonable because she could not prove it was necessary to accommodate her disability. 569 F. App'x 443, 445 (6th Cir. 2014). Similarly, in denying an ADA claim in *Nance v. Goodyear Tire & Rubber Co.*, we explained that the plaintiff there provided no evidence

that the requested accommodations were "necessary accommodations in light of her physical limitations." 527 F.3d 539, 557 (6th Cir. 2008). And in *Cassidy v. Detroit Edison Co.*, we denied an ADA claim because of the "physicians' vague recommendations," explaining that the plaintiff's proposed accommodation "was simply too vague to reasonably inform Defendant of a reasonable accommodation." 138 F.3d 629, 635 (6th Cir. 1998); *see also Reyes v. Krasdale Foods, Inc.*, 945 F. Supp. 2d 486 (S.D.N.Y. 2013) (holding that a doctor's letter requesting that employer accommodate employee's working hours did not establish that modification of employee's schedule was necessary to accommodate his disability). McDonald's fate follows that of the plaintiffs in *Obnamia*, *Nance*, *Cassidy*, and *Reyes*.

McDonald's physician's letter is too vague to show that she needed an extended lunch break. For starters, the letter requests at least thirty minutes of strengthening exercises. McDonald had a thirty-minute lunch break and two other fifteen-minute breaks. Thus, she had one hour's worth of breaks to complete her physician's thirty minutes of recommended exercise. The letter never mentions that the exercises must occur at a certain time in the day. Nor does it provide that the exercises must be for an uninterrupted block of time. The need for a sixty-minute lunch break simply does not follow from this letter, the only piece of evidence McDonald proffered other than her own testimony, which fails to rectify this problem. McDonald testified that she would rather change her lunch schedule to exercise than "wake up early if [she] didn't have to."

In any event, CHR never denied McDonald's request. True, her immediate supervisor told her it was not feasible and suggested alternatives. But the actual decision-makers had not yet rendered their verdict. Nor had they given any signs that her efforts would fail. To the contrary, Gallagher told McDonald that "we think it's going to be okay." But McDonald didn't wait for an answer: she immediately went on personal leave after her suspension and quit just a few weeks

after that. "[A]n employee cannot base a disability discrimination claim upon an employer's delay in providing a requested accommodation where the delay is due to internal processing or to events outside the employer's control." *Gerton v. Verizon S. Inc.*, 145 F. App'x 159, 168 (6th Cir. 2005) (citing *Kaltenberger v. Ohio College of Podiatric Medicine,* 162 F.3d 432, 437 (6th Cir. 1998); *Selenke v. Med. Imaging of Colorado,* 248 F.3d 1249, 1262 (10th Cir. 2001)). The delay here was outside CHR's control. It was also minimal, consisting of only a few days (including a weekend) before McDonald was suspended and then went on personal leave. *See Arndt v. Ford Motor Co.*, 716 F. App'x 519, 527–28 (6th Cir. 2017) (holding that an approximately three-month delay was reasonable due to the novelty of the request for a service dog). Her request also was contrary to the typical break schedule created under the authority granted CHR by the CBA and therefore potentially precedent-setting for all employees. *See id.*

McDonald also suggests that CHR failed to engage in the ADA's required interactive process. But her argument lacks merit because CHR sufficiently interacted with her to satisfy the interactive-process requirement.

"[O]nce the employee requests an accommodation, the employer has a duty to engage in an interactive process to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Mosby-Meachem*, 883 F.3d at 605 (internal quotation marks and citations omitted); *see also* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]."). But, "[i]mportantly, an employee cannot force her employer to provide a specific accommodation if the employer offers another reasonable accommodation." *Talley*, 542 F.3d at 1108. "[T]he employer providing the accommodation has the ultimate discretion to choose between effective

accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996) (quoting 29 C.F.R. Pt. 1630, App. § 1630.9); *see also Smith v. Honda of Am. Mfg., Inc.*, 101 F. App'x 20, 25 (6th Cir. 2004) ("Where there is more than one reasonable accommodation, the choice of accommodation is the employer's."). Both the employer and the employee must participate in the interactive process in good faith. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007); *see also Rorrer*, 743 F.3d at 1040.

Barnett responded to McDonald's e-mail and tried to identify reasonable accommodations to allow McDonald to exercise longer. Barnett immediately proposed an alternative accommodation that McDonald rejected based on preference. We have held that an employer need not offer a counter accommodation to engage in the interactive process in good faith. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202–03 (6th Cir. 2010). So Barnett's efforts here satisfied the requirements of the interactive process. And the higher-ups in the company, like Gallagher, interacted with McDonald over her proposed accommodation, keeping her updated and telling her that her request would likely be okay. These facts further belie any notion of CHR's failure to engage in an interactive process here. *See id.* at 203 (holding defendant's meeting with plaintiff to discuss his proposed accommodations and its offering alternative solutions satisfied the interactive-process requirement). We also have previously noted that an employee who quits before the accommodation request's resolution is at fault for any breakdown in the interactive process, not the employer. *Gleed v. AT&T Mobility Servs., LLC*, 613 F. App'x 535, 539 (6th Cir. 2015). As noted, McDonald quickly quit. So if anyone is to blame for a breakdown in the interactive process, it is her, not CHR. Therefore, even assuming McDonald established a prima

facie case to warrant consideration of the interactive process, no reasonable jury could find that CHR violated that process here.

*ADA Retaliation.* The ADA also prohibits employers like CHR from "discriminat[ing] against any individual because such individual has . . . made a charge . . . under this chapter." 42 U.S.C. § 12203(a). "Discrimination here means retaliation—that 'but for' an employee's statutorily protected activity the employer would not have taken the 'adverse employment action.'" *Ford Motor Co.*, 782 F.3d at 767 (citations omitted). ADA retaliation claims are analyzed under the familiar *McDonnell-Douglas* burden-shifting framework. *Id.* (citation omitted). But we need not get far into that framework here.

McDonald "must first establish, by a preponderance of the evidence, [her] 'prima facie' case." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). To do so, she must present evidence from which a reasonable jury could find but-for causation between her requesting an accommodation and her suspension.[2] *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) (explaining that plaintiff must "establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"); *Ford Motor Co.*, 782 F.3d at 770. She has not done so.

No reasonable jury could have found that McDonald's less-than-two-days suspension from work was because of her request for an extended lunch break. Rather, the record evidence, including her own admission, shows that her deliberate insubordination was the "but for" cause of her suspension. We have "previously held that 'an intervening legitimate reason' to take an adverse employment action 'dispels an inference of retaliation based on temporal proximity.'" *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 628 (6th Cir. 2013) (quoting *Wasek v. Arrow Energy*

---

[2] McDonald also argues that the adverse employment action here was not just her suspension, but also her constructive discharge. We address her constructive-discharge argument below.

10

*Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012)); *see also Wasek*, 682 F.3d at 472 (holding that an employee who complained about harassment and later left without authorization had himself caused an intervening event giving his employer a reason to discipline him). McDonald's insubordination and the follow-up meeting in which she admitted to that insubordination were such intervening events providing CHR a legitimate reason to suspend her for barely two days. And so McDonald's retaliation claim fails.

*Constructive Discharge.* McDonald argues that she was constructively discharged from CHR. For support, she references CHR's alleged ADA violation from declining her request for an extended lunch break, her suspension, and her having to meet with Barnett about Ashton's harassment complaint against her.[3] But these conditions, even viewed in a light most favorable to McDonald, fall short of establishing constructive discharge.

A constructive-discharge claim is "hard to prove. The employee must show that her working conditions were objectively intolerable and that her employer deliberately created those conditions in hopes that they would force her to quit." *Groening v. Glen Lake Cmty. Schs.*, 884 F.3d 626, 630 (6th Cir. 2018). And "[t]he employee has an obligation not to assume the worst, and not to jump to conclusions too fast." *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 515 (6th Cir. 1991) (internal quotation marks and citation omitted).

As an initial matter, as discussed above, no underlying ADA violation exists on which to base a constructive-discharge claim. As for McDonald's suspension, she was warned that leaving to go to the gym early could result in discipline, but she did so anyway. As already noted, she was

---

[3] The second-floor workers' alleged actions towards McDonald are concerning, but McDonald does not reference them as a basis for her constructive-discharge claim. These primarily occurred in the fall of 2013, well before McDonald was suspended in June 2014. At any rate, Barnett met with McDonald about the second-floor situation, but McDonald would not provide any necessary information for corrective action, such as the names of those involved. So this would not help her claim here. *See Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698, 708 (6th Cir. 2012) (holding that employer "took reasonable steps to address the concerns about co-worker harassment" and that a few incidents of disparaging comments by a few co-workers did not alter working conditions).

suspended because of this deliberate insubordination. And regarding her meetings about Ashton, management simply was responding to a workplace complaint. At bottom, no reasonable jury could find that CHR hoped McDonald would quit because of these proffered reasons. McDonald's "jump[ing] to conclusions" by quitting prematurely also cuts against her argument here. So her constructive-discharge claim fails as well.

**III**

In light of the foregoing, we **AFFIRM**.