NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0187n.06

No. 16-3141

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| BRIAN GREEN, | ) | **FILED** |
|  | ) | Mar 27, 2017 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE SOUTHERN |
| BAKEMARK USA, LLC, | ) | DISTRICT OF OHIO |
|  | ) |  |
| Defendant-Appellee. | ) |  |
|  | ) |  |

BEFORE: GIBBONS, SUTTON, and WHITE, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Brian Green began working as an operations manager at BakeMark USA, LLC in October 2010. In September 2011, Green had surgery after being diagnosed with thyroid cancer. Following his surgery, Green made several failed attempts to resume full-time work at BakeMark. Green's employment was ultimately terminated in September 2012 after he informed BakeMark that his disability required an indefinite leave of absence. Green sued BakeMark, its parent company, and several of its employees[1] for failure to accommodate and constructive discriminatory discharge under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* The district court granted summary judgment for defendants on all claims. We affirm.

---

[1] BakeMark is the only remaining defendant in this case.

I.

A.

Brian Green began working for BakeMark as an operations manager at its Fairfield, Ohio, facility on October 25, 2010. BakeMark provides food products and services throughout the United States, and the Fairfield facility is one of its regional distribution centers. As operations manager, Green was responsible for directing and coordinating all warehouse activity, which included: closely interacting with department associates, overseeing transportation operations and personnel to ensure timely deliveries, reviewing weekly reports, maintaining the sanitation and physical condition of the warehouse, and performing other general supervisory tasks.

In early September 2011, Green requested a leave of absence to undergo surgery related to thyroid cancer. This leave was scheduled to last until October 11 but was ultimately extended until October 17 at the request of Green's doctor. Green returned to work without restrictions on October 17.

On November 25, 2011, Green once again requested leave due to thyroid complications. BakeMark approved Green's request, and he was placed on leave until January 2, 2012. Green, however, was unable to return to work on January 2. Instead, he submitted a doctor's note on January 6 stating that, due to "medical issues," he would need an additional month of leave. BakeMark granted Green's request for additional leave through February 19, 2012, but notified Green it would need additional information from Green's doctors prior to granting leave beyond this date. From January 6 to February 19, Green's position remained open and he continued to receive disability benefits under BakeMark's short-term disability plan. BakeMark also flew in other managers, at least intermittently, to cover Green's responsibilities.

On February 17, 2012, Green submitted a doctor's note stating that he could immediately return to work for four hours a day, five days a week, and that this restriction would be in place for thirty days. After meeting to discuss and consider Green's return, BakeMark extended Green's job-protected leave for thirty days, instead of allowing him to return on a part-time basis. Green continued to receive disability payments from BakeMark under its short-term disability plan during this period.

On March 16, 2012, Green submitted a doctor's note stating that he could return to work with an eight-hour-a-day, five-day-a-week restriction, although no durational limit was given for this restriction.[2] BakeMark replied to Green on March 19, requesting clarification as to whether Green did, in fact, have restrictions and, if so, whether the restrictions were permanent or only temporary.[3] On March 20, BakeMark sent Green a follow-up email agreeing to accommodate his eight-hour-a-day work restriction until Green was able to obtain clarification from his doctor or until March 30, whichever came first.

Although instructed to do so by BakeMark, Green did not return to work between March 20 and 23. Instead, on March 23, Green emailed BakeMark a doctor's note clarifying that Green's eight-hour-a-day restriction was in effect only until March 30, after which Green could return to work without restriction. Green returned to work on March 24, and BakeMark accommodated Green's eight-hour-a-day work restriction until March 30.

Green fulfilled his operations-manager duties without incident until May 2, 2012. On May 2, after working twenty-four hours straight, Green arrived home and collapsed. Green did not report for work on May 3. On May 4, Green submitted a doctor's note stating that he could

---

[2] The doctor's note limited Green to an eight-hour-a-day schedule but also stated that Green was released with "no restrictions." CA6 R. 18, Sealed App., at 41.

[3] Green admitted in his deposition that a permanent eight-hour-a-day, five-day-a-week restriction would render him unqualified for the operations-manager position.

return to work on May 7 with an eight-hour-a-day restriction. BakeMark responded that Green could return to work on May 7 but that it would need to discuss the restrictions with him at that time. Green did not return to work on May 7 but instead submitted a doctor's note on May 8 stating, "Brian will need to be off work until I receive and review a copy of expectations on hours and days per week that he is expected to work. At that time I can decide on what would be best for my patient's current health issues." DE 73-1, Ex. 140, at 2967. At this point, BakeMark placed Green on job-protected leave.

On May 30, BakeMark informed Green's doctor that Green could expect to work "10 – 12 hours a day/50 – 60 hours a week" upon his return from leave. CA6 R. 18, Sealed App., at 49. On June 24, the doctor responded that Green could return to work with certain restrictions: a four-hour-a-day restriction for fourteen days, and an eight-hour-a-day restriction for six months thereafter. BakeMark asked Green to participate in a telephonic conference on July 3 to discuss these restrictions. Green declined via email, stating that the proposed restrictions were clear and that he would prefer any future communications take place via written communications. BakeMark promptly responded by email,

> It is very important that we schedule a time for a call to discuss your doctor's note and additional information that the Company needs from you in order for BakeMark to evaluate potential reasonable accommodations. The best way to facilitate this interaction is through verbal conversation. Please remember that you are an active BakeMark employee, and as is the case with any successful employment situation, it is important that you be able to communicate verbally with your colleagues and HR team.

DE 72-1, Ex. 145, Page ID 2785. Green demurred, reiterating his earlier position that his proposed accommodations were clear and restating his preference for written communications in the future. Around this time, Green also applied for, and received, financial benefits under

BakeMark's long-term disability plan, based on his representations that he was medically unable to work as of May 4, 2012.

After several more unsuccessful attempts to schedule a meeting to discuss Green's proposed restrictions, the parties finally agreed to participate in a private mediation in September 2012. In mediation, Green informed BakeMark that he was completely unable to work and did not know if, or when, he would be able to return. Green also provided BakeMark with two letters from health-care providers confirming his inability to return to work in any capacity and stating that he had been suffering from two severe psychological disorders—posttraumatic stress disorder and major depressive disorder—since May 2, 2012. On September 25, BakeMark notified Green that it was unable to accommodate an indefinite leave of absence and terminated his employment.

In October 2012, Green applied for disability benefits (SSDI benefits) with the Social Security Administration (SSA). Based on the representations made in Green's application, the SSA found that Green became disabled "under [its] rules on May 2, 2012," and it awarded him benefits. DE 62-32, Ex. AS, Page ID 1561–62. This is consistent with Green's deposition testimony that he was unable to work in any capacity as of May 2, 2012.

B.

On October 16, 2013, Green and his wife sued BakeMark, its parent company CSM WorldWide, and various employees of BakeMark in the Common Pleas Court of Butler County, Ohio. The defendants timely removed the case to the United States District Court for the Southern District of Ohio. On December 11, 2013, the Greens voluntarily dismissed all of their claims against CSM and some of their claims against the remaining defendants. On April 22, 2015, Mrs. Green dropped out of the lawsuit altogether. On January 20, 2016, the district court

granted summary judgment for the remaining defendants on Green's remaining claims. The district court found that BakeMark had not, as Green alleged, failed to accommodate him in February 2012, March 2012, or the summer of 2012. The district court further concluded that, because BakeMark had not violated the ADA at any of these various junctures, it could not be liable for constructive-discriminatory discharge. Green filed this timely appeal.

## II.

We review a district court's grant of summary judgment *de novo*. *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 644 (6th Cir. 2015) (citing *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012)). The movant is entitled to summary judgment as a matter of law where the pleadings, affidavits, and other discoverable evidence show no genuine issue of material fact. *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 557 (6th Cir. 2009) (citing Fed. R. Civ. P. 56(c)). Only material factual disputes, which are determined by the substantive law governing the issue, will be sufficient to withstand a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We construe all facts and inferences in favor of the non-movant to determine if there exists "sufficient evidence for a trier of fact to find for that party." *Wheat v. Fifth Third Bank*, 785 F.3d 230, 236 (6th Cir. 2015).

## III.

Under the ADA, an employer is prohibited from discriminating "against a qualified individual on the basis of [a] disability." 42 U.S.C. § 12112(a). An employer discriminates within the meaning of § 12112(a) when it fails to make "reasonable accommodations to the known physical or mental limitations" of an otherwise qualified employee, unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation" of its business. *Id.* § 12112(b)(5)(A). To establish a *prima facie* case of failure to accommodate

under § 12112(b)(5)(A), an employee must show that: (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified for the position, such that he can perform the essential functions of the job with or without a reasonable accommodation; (3) the employer knew or had reason to know of his disability; (4) the employee requested an accommodation; and (5) the employer failed to provide a reasonable accommodation thereafter. *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982–83 (6th Cir. 2011); *see Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007). Once an employee establishes a *prima facie* case, "the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer." *Johnson*, 443 F. App'x at 983. Green alleges that BakeMark violated the ADA[4] by failing to accommodate his disability on three separate occasions: in February 2012; in March 2012; and in the summer of 2012.

A.

Green cannot succeed on his February 2012 failure-to-accommodate claim because he has not shown that he was "qualified" for the operations-manager position within the meaning of the ADA. A "qualified individual" under the ADA is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position [he] holds or desires." 42 U.S.C. § 12111(8); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015). A "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position," 42 U.S.C. § 12111(9)(B), but "it does *not* include removing an 'essential function' from the position, for that is *per se* unreasonable." *Ford Motor*, 782 F.3d at 761 (citation omitted). Therefore, while a part-time

---

[4] To the extent Green is also appealing his state-law disability claims, because Ohio's handicap-discrimination statute was modeled after the ADA, "[t]he standards for demonstrating a prima facie case under either [Ohio Rev. Code § 4112.02(A) or the ADA] are virtually identical." *See House v. Kirtland Capital Partners*, 814 N.E.2d 65, 75–76 (Ohio Ct. App. 2004); *see also Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004).

work schedule may be a reasonable accommodation in some cases, 42 U.S.C. § 12111(9)(B), it is unreasonable in situations where the essential functions of the job require full-time attendance. *See White v. Standard Ins. Co.*, 529 F. App'x 547, 549–50 (6th Cir. 2013). A job function is "essential" if it is "'fundamental,' (as opposed to 'marginal')," such that the position is "fundamentally altered" if the function is removed. *See Ford Motor*, 782 F.3d at 762 (citing 29 C.F.R. § 1630(n)(1)). ADA regulations help illuminate what job functions are essential by providing several non-exclusive factors for consideration:

(i) The employer's judgment as to which functions are essential;
(ii) Written job descriptions . . .;
(iii) The amount of time spent on the job performing the function;
(iv) The consequences of not requiring the incumbent to perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

On February 17, 2012, Green submitted a doctor's note stating that he could immediately return to work four hours a day, five days a week, and that this restriction would be in place for thirty days. After considering this request, BakeMark instead extended Green's job-protected leave for an additional thirty days. The basis for BakeMark's decision was its belief that Green would be unable to perform the essential functions of his position working only four hours a day, five days a week. Whether Green was "qualified" under the ADA in February 2012 turns on whether BakeMark was correct in concluding that Green could not perform the essential functions of his operations-manager position working four hours a day, such that a part-time accommodation was unreasonable. On this record, we conclude that it was.

First, several members of BakeMark management testified that the operations-manager position requires, at a minimum, fifty hours per week, much more than the twenty hours a week

in Green's accommodation request.[5] Second, Green's own experience working long hours as an operations manager belies any claim that he could perform the essential functions of the position working four hours a day, five days a week. In fact, Green testified that he would be unqualified for the position with even an eight-hour-a-day, five-day-a-week restriction.[6] Third, the written job description for operations manager emphasizes the position's full-time nature by stressing the "supervisory responsibilities" inherent in the position, including "closely interacting with department associates." CA6 R. 18, Sealed App., at 4–6. It is difficult to fathom how Green could adequately fulfill his supervisory role if he were there to supervise and interact with the associates only part-time. *See Ford Motor*, 782 F.3d at 761–62 (noting that "regularly attending work on-site is essential to most jobs, . . . especially those involving teamwork and a high level of interaction"). Accordingly, a twenty-hour-per-week part-time work schedule would not have allowed Green to perform the essential functions of the operations-manager position. Green's proposed accommodation was therefore unreasonable, and BakeMark was not required to provide it.

Green's arguments to the contrary are unavailing. Green claims that because BakeMark failed to fill his position while he was on leave—instead opting to fly in replacement managers on an infrequent basis—he would have been performing more duties in four hours than were being performed in his absence. But the record shows that BakeMark frequently flew in other managers to cover for Green during most, if not all, of his absence.

---

[5] Green relied on General Manager Steve Weltzin's deposition testimony that working more than eight hours a day, five days a week is not an essential function of the operations-manager position. But Weltzin clarified later in his deposition that the position is not a forty-hour-a-week position and that operations managers were expected to work, on average, ten-to-twelve hour days.

[6] We do not mean to imply that fact questions would not arise at some point regarding whether BakeMark had an obligation to accommodate an eight-hour-a-day schedule for some period of time, which, in fact, it did here.

9

Green also argues that if he cannot perform the essential functions of his position on a part-time basis, it necessarily follows that no employee could ever perform the essential functions of the employee's position on a part-time basis, thus removing this as a potential accommodation under the ADA in violation of § 12111(9)(B). This is misguided. A part-time or flexible schedule may be a reasonable accommodation under the ADA in some cases. *See Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1146–47 (10th Cir. 2011). In Green's case, however, the four-hour part-time schedule was not a reasonable accommodation because the essential functions of the operations-manager position could not be performed within those restricted hours and Green proposed no other reasonable option for getting his work done outside of those hours. *See White*, 529 F. App'x at 549; *see also Lamb v. Qualex, Inc.*, 33 F. App'x 49, 57 (4th Cir. 2002) ("[A] plaintiff who can work only on a part-time basis cannot be a 'qualified individual with a disability' if the ability to work full-time is essential to his job."). Green's position required him to supervise and interact closely with department associates for, at a minimum, fifty hours a week. This function could not be performed while working a four-hour part-time day. And having established that the operations-manager position required full-time attendance, the ADA did not require BakeMark to create a special, part-time position in order to accommodate Green. *Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 709 (6th Cir. 2015); *see also Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998). Nor was BakeMark obliged to incur the expense of flying in other operations managers to work part of the day.

At best, Green's proposed accommodation would have allowed him to perform only some functions of his position, some of the time. The ADA requires more. Because Green could not perform the essential functions of his position with any reasonable accommodation in

February 2012, he was not a "qualified individual" under the ADA. Summary judgment was therefore proper on this claim.[7]

B.

Green's March 2012 failure-to-accommodate claim also falls short because Green received the only accommodation he requested. To prevail on a failure-to-accommodate claim under the ADA, an employee must show that he actually requested an accommodation. *Johnson*, 443 F. App'x at 982–83. The initial burden of requesting an accommodation rests with the employee. *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998). "The employer is not required to speculate as to the extent of . . . the employee's need or desire for an accommodation." *Id.* at 1046–47.

On March 16, 2012, Green sent BakeMark an email stating that he could return to work on March 19 without restrictions. The doctor's note attached to the email, however, stated that Green could work eight hours a day, five days a week, and did not state a time limit for this restriction. In response, BakeMark emailed Green to have his doctor clarify whether Green actually had restrictions, and, if so, whether the restrictions were permanent or temporary. On March 20, BakeMark sent Green a follow-up email agreeing to accommodate Green's eight-hour-a-day schedule, as Green's doctor requested, until Green was able to obtain clarification from his doctor or until March 30, whichever came first. BakeMark then instructed Green to return to work on March 21.

Green did not return to work on March 21. Instead, on March 23, Green provided BakeMark a doctor's note clarifying that Green could work eight hours a day, five days a week until March 30, after which he could work "without restriction." CA6 R. 18, Sealed App., at 47.

---

[7] Because Green could not perform the essential functions of the operations-manager position with or without reasonable accommodation in February 2012, we need not address whether BakeMark's grant of leave was a reasonable alternative accommodation.

11

BakeMark allowed Green to work with the eight-hour-a-day restriction until March 30, after which Green resumed his normal work schedule.

Green claims that BakeMark failed to accommodate him when it did not allow him to work with the eight-hour-a-day restriction beyond March 30. But Green did not request such an accommodation. He requested only that he be allowed to work with this restriction *until* March 30, after which, as his doctor stated, he could resume a normal work schedule. BakeMark provided Green with this accommodation.

Green nevertheless argues that he limited his accommodation request in response to BakeMark's March 20 email, in which BakeMark stated that it would provide Green with an eight-hour-a-day restriction only until March 30. Although this may be true, if Green believed that an hour restriction beyond March 30 was necessary to accommodate his disability, it was his responsibility to make that request. *See Gantt*, 143 F.3d at 1046. BakeMark was not required to speculate as to Green's need for an additional accommodation beyond what Green specifically requested in his March 23 email. *Id.* at 1046–47. Accordingly, because BakeMark provided Green with the only accommodation he requested in March 2012, we affirm the district court's grant of summary judgment to BakeMark on this claim.

## C.

Finally, Green's failure-to-accommodate claim for the summer of 2012 fails because, as was the case with his February 2012 claim, the record as a whole does not create a genuine factual dispute as to whether Green was "qualified" for the operations-manager position in the summer of 2012. He was not. Although the June 24, 2012 doctor's note indicated that Green could return to work with certain hour restrictions—four hours a day for a period of fourteen days, and eight hours a day for a period of six months—this assertion is controverted by the

overwhelming evidence in the record that Green was unable to work at all in the summer of 2012, including: (1) Green's deposition testimony that he was unable to work "in any capacity" after May 2, 2012; (2) the SSA's finding that Green was disabled under its rules as of May 2, 2012;[8] (3) Green's doctor's statement to Aetna, BakeMark's short-term disability administrator, that Green had been disabled from work since May 4, 2012; (4) Green's interrogatory responses that he has neither sought nor performed any work since May 1, 2012; and (5) statements submitted by Green's doctors during mediation that Green had suffered from PTSD and major depressive disorder since May 2, 2012.

On this record, no reasonable juror could find that Green was able to perform the essential functions of the operations-manager position, with or without reasonable accommodation, in the summer of 2012. *See Cleveland*, 526 U.S. at 807; *see also Anderson*, 477 U.S. at 252. Green was therefore not a "qualified individual" under the ADA, and, as such, summary judgment was proper on this claim.

IV.

Green also claims that BakeMark's repeated failure to accommodate him caused him to develop severe psychological disorders, which ultimately rendered him unable to work and provided the basis for BakeMark to terminate him in September 2012. BakeMark's actions, Green claims, amount to a constructive-discriminatory discharge in violation of the ADA. We agree with the district court that Green cannot show constructive-discriminatory discharge

---

[8] We recognize that the SSA's determination that Green was disabled does not bar his ADA claim. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 797–98 (1999). Green, however, must adequately explain why his SSDI claim and award are consistent with his current ADA claim that he was able to perform the essential functions of his operations-manager position with or without reasonable accommodation in the summer of 2012. *Id.* at 807. He has not done so. His claim that he was able to work with an eight-hour-a-day accommodation during this period is inconsistent with his SSDI claim under any scenario.

because he has not established that BakeMark violated the ADA at any point after he became disabled.

To establish a *prima facie* case of discriminatory discharge under the ADA without direct evidence of discrimination, Green must show that: (1) he was disabled; (2) he was otherwise qualified to perform the essential functions of his position, with or without reasonable accommodation; (3) he suffered an adverse employment action; (4) BakeMark knew or had reason to know of his disability; and (5) the position remained open or a non-disabled person replaced him. *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012) (citing *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 417 (6th Cir. 2004)). Once a plaintiff makes out a *prima facie* case, the "burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action." *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).

In this circuit, constructive discharge qualifies as an adverse employment action under the ADA. *See Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1107 (6th Cir. 2008). Whether an employee can prevail on a constructive-discharge claim "depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee." *Id.* (citation omitted). Specifically, it requires a showing that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* (citation omitted). Importantly, the employer must have "*deliberately* create[d the] intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit." *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (emphasis added). In the failure-to-accommodate context, "a complete failure to accommodate, in the face of repeated

requests, might suffice as evidence to show the deliberateness necessary for constructive discharge."[9]  *Talley*, 542 F.3d at 1109 (quoting *Johnson v. Shalala*, 991 F.2d 126, 132 (4th Cir. 1993)).

BakeMark clearly had the right to terminate Green's employment in September 2012 when it was obvious he could not return to work in any capacity for the foreseeable future.  *See Harris v. Circuit Court*, 21 F. App'x 431, 432 (6th Cir. 2001).  The issue, then, is whether BakeMark's treatment of Green prior to this point was sufficiently egregious to support a constructive-discharge claim under the ADA.  It was not.

Because Green has not shown that BakeMark failed to accommodate him under the ADA in February 2012, March 2012, or the summer of 2012, he has not established the requisite deliberateness necessary to sustain a constructive-discharge claim against BakeMark.  *Talley*, 542 F.3d at 1109.  Moreover, even if we had found that BakeMark failed to accommodate Green at one of these various junctures, BakeMark's actions are still not analogous to conduct we have found sufficient to support a constructive-discharge claim.  In *Talley*, for example, we concluded that a reasonable juror could have found that the employer's conduct was intended to make the employee resign when it: (1) suddenly denied the employee an accommodation it had provided for years; (2) refused to read a doctor's note the employee provided; (3) failed to organize a meeting to discuss the employee's requested accommodations; and (4) failed to propose alternative accommodations.  *Id.* at 1109.  BakeMark, conversely, did none of that.  Instead, it

---

[9] The *Talley* court qualified this holding, stating:

> [O]ur holding today does not pave the way for an employee to assert a claim for constructive discharge every time an employer fails to accommodate her disability. But when an employee makes a repeated request for an accommodation and that request is both denied and no other reasonable alternative is offered, a jury may conclude that the employee's resignation was both intended and foreseeable.

542 F.3d at 1109.

(1) openly communicated with Green's doctor; (2) repeatedly attempted to arrange meetings with Green to discuss potential accommodations; and (3) proposed alternative accommodations when necessary. Green, accordingly, cannot show that BakeMark "deliberately create[d] intolerable working conditions . . . with the intention of forcing" Green to quit, or, as relevant here, to go on permanent medical leave. *See Moore*, 171 F.3d at 1080; *see also Gleed v. AT&T Mobility Servs., LLC*, 613 F. App'x 535, 540 (6th Cir. 2015) ("[T]he denial of an accommodation, by itself, is not sufficient to prove that an employer constructively discharged an employee."). For these reasons, we affirm the district court's grant of summary judgment on Green's constructive-discharge claim.

V.

For the reasons stated above, we affirm the district court on all counts.