NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0130n.06

No. 23-3459

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 18, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| CHARITY HUNT, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| RANDY THORP, Licking County Sheriff, | ) | |
| Defendant-Appellee. | ) | |
| | ) | OPINION |
| | ) | |

Before: SUTTON, Chief Judge; WHITE and BUSH, Circuit Judges.

BUSH, J., delivered the opinion of the court in which SUTTON, C.J., joined. WHITE, J. (pp. 20–27), delivered a separate dissenting opinion.

JOHN K. BUSH, Circuit Judge. This case arises from Charity Hunt's complaint of disability discrimination suffered in her workplace. The Licking County Sheriff's Office (LCSO), in May 2018, hired Hunt as a dispatcher. After approximately one year, she transferred to a new position, the LCSO Dispatcher-Data Entry Specialist. In that job, she primarily entered warrants and protective orders into the LCSO's data system. But she was also expected to continue performing dispatch duties when needed.

After a bipolar episode severe enough to warrant an extended leave, Hunt attempted to return to work. She requested that she no longer be required to perform dispatch duties because of the stress of that task. After the LCSO rejected her request, Hunt sued for violations of the Americans with Disabilities Act (ADA) and Family and Medical Leave Act (FMLA).

This appeal comes down to one question: whether dispatch duties are an essential function of Hunt's position as a Dispatcher-Data Entry Specialist. The district court determined that they are and thus held that Hunt was not a qualified individual under the ADA. Accordingly, she was not entitled to the ADA's protections, or related FMLA protections. For reasons that follow, we agree with the district court and therefore AFFIRM.

## I.

### 1. The Licking County Sheriff's Office

The LCSO is a law enforcement agency overseen by Sheriff Randy Thorp and Colonel Chad Dennis. One of its divisions, the Communications Division, provides dispatch services for most law enforcement agencies within Licking County.

Dispatchers answer incoming phone calls from both the public and law enforcement officers, then operate radio consoles to relay information to law enforcement, and dispatch personnel and cruisers to disturbances. At times, dispatchers also enter warrants, civil protection orders, and other relevant information into the Law Enforcement Automated Data System (LEADS). Laura Keene, the supervisor for first-shift dispatchers, is primarily responsible for inputting information into LEADS, though she delegates this data-entry work to dispatchers as needed.

### 2. Hunt's experience with the LCSO

In May 2018, the LCSO hired Hunt as a dispatcher. After working in that capacity for over a year, Hunt applied to be a Dispatcher-Data Entry Specialist.[1] Hunt Dep., R.17, PageID 390;

---

[1] The job advertisement refers to this position in two ways: as a "Dispatcher-Data Entry Specialist" and "Position: Patrol-Communications Data Entry Specialist." Written Job Description, R. 16-3, PageID 321. We refer to the job as Dispatcher-Data Entry Specialist because that is most consistent with deposition testimony.

Written Job Description, R. 16-3, PageID 321. According to the LCSO job posting, this position was a transfer opportunity.

On August 2, 2019, the LCSO hired Hunt to be the first Dispatcher-Data Entry Specialist. The LCSO also hired someone to replace Hunt in her prior dispatch role and removed her from the dispatcher schedule. After Hunt started her new position, dispatchers largely stopped entering warrants and civil protection orders into LEADS, as this was now primarily Hunt's responsibility. From August 2, 2019, until April 2, 2020, Hunt typically spent eight hours a day entering warrants and protection orders, doing validations, and working on other entries associated with her new position, although her desk remained in the "radio room" with the other dispatchers so that she could jump on calls when needed. Hunt Dep., R. 17, PageID 406–07.

During her first three months as a Dispatcher-Data Entry Specialist, Hunt performed dispatch duties on four separate occasions. Once, the LCSO required Hunt to fill in for a sick dispatcher. On the other three occasions, Hunt took calls during part of her shift, while the LCSO trained the dispatcher hired to fill Hunt's former position. One of those instances involved an emergency in which a semitruck was in a highspeed chase and Hunt helped with the "overflow of calls." Hunt Dep., R. 17, PageID 406.

### 3. The impact of COVID-19 on the Licking County Sheriff's Office

When the COVID-19 pandemic began in the spring of 2020, Sheriff Thorp implemented a scheduling change in the Communications Division. To limit in-person contact, all Communications employees worked 32 hours per week but were paid for 40 hours of work. That change went into effect on April 4, 2020, and lasted until approximately May 14, 2020.

In implementing Sheriff Thorp's COVID schedule with the required staffing levels, Lieutenant Dan Loper and Keene identified a vacancy on third shift.[2] To fill that position, they proposed moving Hunt, a first-shift employee, to third shift.

### 4. The impact of COVID-19 on Hunt

On April 19, 2020, Hunt made the move to third shift. The transition caused her to struggle. Her dispatching skills were "rusty," and there had been changes to the dispatch system. Hunt Decl., R. 27-4, PageID 1697 at ¶ 11. She needed help from her co-workers to log on to and become oriented with the new system. *Id*. More importantly, the overnight nature of third shift prevented her from strictly adhering to the medication regime regulating her bipolar disorder, and the irregular sleep schedule negatively affected her mental health.

After a couple of shifts, Hunt explained to Keene that her medication schedule made it difficult for her to adjust to her new schedule. Hunt also emailed Loper to explain that her transition to third shift was exacerbating her health conditions. Hunt requested, and Loper agreed, for her to be removed from third shift. Hunt began working second shift on May 1, 2020. While on this shift, Hunt avoided radio-dispatch duties by performing call-taking duties for one of her co-workers.

### 5. Hunt's request to return to her pre-pandemic duties

Around May 14, 2020, Hunt learned that Sheriff Thorp was ending the COVID schedule. She then asked Keene if that meant that she could return to her normal schedule. But Keene told Hunt that she would need to remain on second shift "a little while longer" because the LCSO still needed her to perform dispatch duties, given the Communications Division's workload. Keene

---

[2] The three dispatcher shifts are as follows: day shift (7:00 a.m. to 3:00 p.m.), second shift (3:00 p.m. to 11:00 p.m.), and third shift (11:00 p.m. to 7:00 a.m.).

Dep., R. 16, PageID 191; Loper Dep., R. 21, PageID 976–77. According to the LCSO, because the Licking County Courts were not fully operational coming out of the pandemic, there was less of a need to enter warrants and protections orders into LEADS.[3]

### 6. Hunt's FMLA leave

The day after Hunt learned that she would remain on second shift, she notified Sergeant Josh Hufford that she needed two vacation days. Hunt explained that she was under her doctor's care, and that the physician advised her not to work until further notice. On May 20, 2020, Hunt updated Keene on her condition. Keene then wrote Loper:

> Charity [Hunt] called me to advise she is having some stress issues and she [h]as a scheduled phone call appointment with her Doctor in the morning. Charity advised that the Doctor may put her on FMLA. Charity advised she is concerned about **"putting the lives of the officers in her hands."** Charity requested another vacation day for May 21st. As of today, 05/20/20 Dispatcher Charity Hunt [h]as worked 15 days out of the last 55 days once she was notified that she would be returning to dispatch due to the Covid-19 pandemic.

Memo from Keene to Loper, R. 16-5, PageID 323 (emphasis in original).

After notifying Keene of her health issues, Hunt submitted her FMLA paperwork to obtain leave from May 15, 2020, through June 22, 2020. The basis for FMLA leave was that she was experiencing a bipolar episode "triggered by the COVID conditions in the workplace." FMLA paperwork, R. 16-9, PageID 331. Hunt explained that her recent episode had been triggered by the switch to third shift. She had "the extreme stress of worrying about contracting COVID because [of] a suppressed immune system due to strong rheumatoid arthritis medication." *Id.* The

---

[3] Hunt disputes this fact. She contends that LEADS statistics indicate only a very slight decrease in warrants and protection orders during the pandemic. Appellant Br. at 14. Specifically, she asserts that from January 1, 2020, to February 28, 2020, the LCSO entered an average of 5.5 warrants per day and 1.6 protective orders, and those numbers decreased only slightly to 5.3 warrants per day and 1.5 protective orders for the subsequent period of April 15, 2020, through August 3, 2020. *Id.* at 14–15.

schedule made her condition worse because it interfered with the "strict sleep schedule" that she was required to follow to manage her bipolar disorder. *Id.*

At the end of her initial FMLA leave period (June 22, 2020), Hunt was unable to return to work. Her doctor ultimately extended her leave to August 3, 2020. According to Keene, Hunt's doctor determined that Hunt was about "80% healed" but "want[ed] her to be 100% before returning to work." Memo from Keene to Loper, R. 16-5, PageID 324.

### 7. Hunt's indication that she was ready to return to work, but could not perform dispatch duties

On July 28, 2020, Hunt submitted a completed fitness-for-duty packet. Her physician cleared her to perform "data entry" work but, because of the bipolar disorder, restricted her from working third shift and performing dispatch duties. Fitness for Duty, R. 16-12, PageID 342, 345.

At that time though, Hunt was still needed for dispatch work, while the need for data-entry work remained low and in case of an emergency. Keene therefore believed that Hunt was not fit for duty. Loper, Sheriff Thorp, and Colonel Dennis all agreed. On July 31, 2020, Loper notified Hunt that she would not be permitted to return to work until her physician released her to perform dispatch duties.

Hunt responded to Loper on August 3, 2020. After explaining that she was unable to obtain a release to perform dispatch duties, Hunt asked if there were any available positions for which she was qualified. She also explained that she could call-take but could not dispatch. Loper notified Captain Evans and Colonel Dennis about Hunt's request.

On August 5, 2020, Loper formally emailed Hunt that the only vacant positions required dispatching. That email also included a letter notifying Hunt that (1) her FMLA leave would expire on August 13, 2020, and (2) if she was unable to return to unrestricted work on August 13,

2020, she could request a leave of absence without pay pursuant to the collective bargaining agreement. R. 16-14, PageID 356. Hunt did not request an unpaid leave of absence. She did file for unemployment compensation. Her application for those benefits led the LCSO to believe that she had abandoned her position, and in response, the LCSO terminated her employment.

On September 16, 2021, Hunt filed a lawsuit asserting multiple claims under the ADA, FMLA, and related Ohio law against Sheriff Thorp in his official capacity. In particular, she alleged that Sheriff Thorp failed to accommodate her disability and then terminated her in violation of the ADA, retaliated against her for engaging in protected activity, interfered with her right to take FMLA leave, and violated Ohio law by failing to accommodate her and wrongfully terminating her.[4]

Sheriff Thorp moved for summary judgment on all of Hunt's claims on December 9, 2022. That same day, Hunt moved for partial summary judgment on her disability discrimination claims. On April 27, 2023, the district court entered summary judgment in favor of Sheriff Thorp on all claims. This appeal followed.

## II.

We review a district court's grant of summary judgment de novo. *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019). Summary judgment is appropriate when there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute of material fact only if there is sufficient evidence for a jury to reasonably resolve a material factual issue in favor of either party.

---

[4] Although Hunt initially raised disability discrimination claims under both state and federal law, her opening brief is limited to the federal claims, with only a short and largely unsupported mention of state-law claims. *See* Appellant Br. at 26. Thus, the court addresses only the claims raised in her opening brief—that is, the federal claims. *See Scott v. First S. Nat'l Bank*, 936 F.3d 509, 522 (6th Cir. 2019).

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). At the summary judgment stage, we construe all reasonable inferences in the nonmovant's favor. *Burwell v. City of Lansing*, 7 F.4th 456, 462 (6th Cir. 2021).

**III.**

**A.     ADA Claim**

**1.  Essential Function**

The district court correctly determined that Hunt is not a qualified individual under the ADA because she cannot perform all essential functions of her position with or without reasonable accommodation, and thus her ADA claim fails as a matter of law. The ADA bars employers from discriminating against a "qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a). To establish a prima facie case of disability discrimination, Hunt must show that (1) she is actually disabled or regarded as having a disability; (2) she is "otherwise qualified" for the position, "with or without reasonable accommodation;" (3) she "suffered an adverse employment decision;" (4) the LCSO "knew or had reason to know of her disability;" and (5) either the position remained open while the LCSO sought applicants or the individual was replaced. *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023) (quotation omitted); *see* 42 U.S.C. §§ 12102(1)(A), (C).

Hunt claims a disability based on her bipolar disorder. Neither party disputes that Hunt has this condition and that it makes her actually disabled under 42 U.S.C. § 12102(1)(A). Thus, we will assume that she has established the first element. However, Hunt cannot establish element two: she lacks evidence that would allow a reasonable jury to find that she was otherwise qualified for her position.

To be an "otherwise qualified" individual, Hunt must show that she was able to perform the essential functions of her role or the role she desired with or without reasonable accommodations. 42 U.S.C. § 12111(8). A reasonable accommodation may include "job restructuring [and] part-time or modified work schedules." *Id.* § 12111(9)(B). But it is per se unreasonable for an accommodation to eliminate an essential function of the role. *EEOC v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (en banc). And "the ADA does not require employers to accommodate individuals by shifting an essential job function onto others." *Hoskins v. Oakland Cnty Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000). Ultimately, the burden is on the employee to propose a reasonable accommodation. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010).

Hunt bases her ADA claim on the contention that her request for no dispatch work was a reasonable accommodation that the LCSO could have provided. But if, as the LCSO claims, dispatch work is an essential function of her position, then Hunt's claim cannot survive summary judgment. That is because if Hunt's accommodation request would exempt her from performing an essential function, then "[o]ne conclusion (the function is essential) leads to the other (the accommodation is not reasonable)." *EEOC*, 782 F.3d at 763; *accord Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 418 (6th Cir. 2021).

This court considers various factors to determine whether a function is essential. These considerations include (1) an employer's judgment, (2) the written job description, (3) the amount of time spent performing a function, (4) the consequences of not requiring someone to perform a function, (5) the terms of the collective bargaining agreement, and (6) the work experience of past and current individuals in that role. 29 C.F.R. § 1630.2(n)(3) (2012). The determination of whether a function is essential "should reflect the actual functioning and circumstances of the

particular enterprise involved." *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988). We must also give some deference to the employer's judgment in deciding which functions of a job are essential. 42 U.S.C. § 12111(8); *see EEOC*, 782 F.3d at 761–62 ("Essential functions generally are those that the employer's 'judgment' and 'written [job] description' prior to litigation deem essential.").

The LCSO put forth uncontroverted evidence that dispatch work is an essential function of the Dispatcher-Data Entry Specialist position.

First, the LCSO's judgment, prior to litigation, reflects that dispatch duties are an essential function of Hunt's position. For example, when circumstances necessitated an additional dispatcher after Hunt transferred to the Dispatcher-Data Entry Specialist position, the LSCO ordered her to dispatch. And when the pandemic caused a change in personnel needs and scheduling, Hunt was moved back to performing primarily dispatch. When she requested a shift change and inquired about when she would return to doing primarily data entry work, Loper directed Hunt to focus on her dispatch duties. *See* R. 16-7, PageID 328 ("[U]nderstand you are still in the dispatcher classification and due to this pandemic that's where we need you to work. In reference to entering CPO's, Warrants etc. [d]on't worry about that for the time being.").

Moreover, when Hunt submitted her completed fitness-for-duty packet at the end of her FMLA leave, explaining that she could return to work but could not perform dispatch duties, Loper responded that she could not return until she was cleared to perform dispatch duties. Keene, Sheriff Thorp, and Colonel Dennis all agreed with Loper that dispatch was a necessary part of Hunt's job and that she could not return until she was able to perform that function. *Cf. Rorrer v. City of Stow*, 743 F.3d 1025, 1043 (6th Cir. 2014) (noting the "conflicting testimony about the essential

functions of a Stow firefighter" and specifically how one supervisor did not deem the function at issue "essential").

Second, the job description indicates that dispatch is part of the position's responsibilities. The posting states:

> Under general supervision of Patrol Division and Communications Center supervisory personnel, individuals in this classification are responsible for; answering incoming phone calls, operating radio console and peripheral electronic equipment to relay information concerning law enforcement and other emergency information. This position's primary responsibility is all LEADS entries, modifications, validations and removals. This position is responsible for acting as a liaison with outside agencies and courts concerning LEADS entries.

Written Job Description, R. 16-3, PageID 321. Although the job description states that the position's primary responsibility is LEADS entries, it still explicitly recognizes that dispatch is a requirement. Indeed, the job title itself recognizes this duty: "*Dispatcher*-Data Entry Specialist." *Id.* (emphasis added). Also, Hunt confirmed that she saw the written posting. And her actions indicate that she understood that dispatch duties remained a part of her job after the transfer. *See* Hunt Dep., R. 17, PageID 408 (explaining that sometimes she took calls "on [her] own . . . to help out"); *id.* at 405 (explaining that she followed orders and helped with dispatch even after transferring to primarily LEADS work); *id.* at 448 (Hunt stating that "I did not dispute that I was in the [dispatcher] classification").

Hunt contends, however, that the written description suggests that dispatch duties were only a marginal function of the position, which primarily concerned LEADS entries. *See* Appellant Br. at 32, 38. As such, she argues that her requested accommodation was reasonable. *See, e.g.*, *Keith v. Cnty. of Oakland*, 703 F.3d 918, 925 (6th Cir. 2013) ("According to the regulations, 'essential functions' refer to job duties that are 'fundamental' rather than 'marginal.'") (citing 29 C.F.R. § 1630.2(n)(1)). In support, Hunt cites the undisputed fact that between August

3, 2019, and April 3, 2020, she performed dispatch duties on only four occasions. Appellant Br. at 8–9. In fact, she was ordered to dispatch so infrequently that when she eventually transferred primarily to dispatch work during the pandemic, she needed help from her co-workers getting set up with the system because her skills were "rusty." Hunt Decl., R. 27-4, PageID 1697 at ¶ 11. Hunt further suggests that the LCSO's failure to maintain her dispatch skills undercuts the point that dispatch services may be needed during an emergency because she would not be able to efficiently switch roles. *See* Appellant Br. at 32.

Hunt's argument is relevant to the third factor of our inquiry: the amount of time spent performing the function. 29 C.F.R. § 1630.2(n)(3)(iii) (2012). But her point is unpersuasive for many reasons. First, it lacks sufficient support in the record. Hunt's difficulty in using the dispatch system seems to have been but a minor issue. She stated that she only needed help logging on and "find[ing] things on the system," but that the other dispatchers on duty were able to help her. Hunt Decl., R. 27-4, PageID 1697 at ¶ 11. Second, she did not request "refresher" training before going back to doing primarily dispatch work during the pandemic, which demonstrates that she was not concerned about her skills to use the dispatch system. *See* Hunt Dep., R. 17, PageID 435–36. And, perhaps more importantly, the LSCO *did* need Hunt for dispatch work during an emergency: when a semitruck was involved in a highspeed chase, the LCSO deployed Hunt because it required an extra person to assist with calls and dispatch.

Hunt contends that this particular instance does not demonstrate that dispatch was an essential function for two reasons: first, she did not actually perform any "dispatch" work during the semitruck emergency and instead only helped with "call taking"; and second, there was another emergency—a major flood—in which she was not asked to help despite being on duty. Appellant Br. at 36. But Hunt's counterarguments are unavailing. She herself testified that sometimes she

was able to perform strictly call taking rather than dispatch work because *she* would ask a co-worker to switch roles with her. Hunt Dep., R. 17, PageID 451. So the fact that she did call taking instead of dispatch during the semitruck emergency (perhaps of her own volition rather than at the direction of the LCSO) does not indicate that dispatch was not needed or that dispatch is only a marginal function of her job. *See also Hoskins*, 227 F.3d at 729 ("[T]he ADA does not require employers to accommodate individuals by shifting an essential job function onto others."). And even though Hunt was not needed during the flood emergency, that does not change the fact that the LCSO may need to deploy her as a dispatcher in other emergencies. That her desk was in the same room as the other dispatchers supports that the LCSO expected that she would be available for dispatch work when needed.

The dissent asserts that we have improperly considered the third factor. Specifically, the dissent explains that "dispatching" refers to a "bundle of duties" that includes both call-taking and dispatching emergency personnel. Dissent at 20. And because "Hunt was never directly asked by the LCSO to place a call to emergency personnel, let alone to dispatch individuals in an emergency," the dissent argues that the third factor weighs in favor of Hunt. Dissent at 23. We do not share the dissent's view. The LCSO (and Hunt) understood dispatch to mean both call-taking and dispatching emergency personnel; the LCSO therefore did not need to inform Hunt that when she was ordered to do dispatch she also had to "place calls to emergency personnel." That requirement is implicit in what dispatching is understood to mean. It would not make sense to require that every time an employer asks an employee to conduct a particular task, the employer must also list each individual component of that task.

Besides, Hunt's record of pandemic dispatch work demonstrates that it was an essential function of the Dispatcher-Data Entry Specialist position. In April 2020, the LSCO ordered Hunt

to cease all LEADS work and exclusively work in dispatch. That fact evinces the essential nature of dispatch work while Hunt was in the Dispatcher-Data Entry Specialist position because it shows that, when the need arose, Hunt was asked to prioritize dispatch work *over* LEADS entries. Put differently, the LSCO deemed dispatch work, not LEADS entries, to be the primary function of Hunt's job during that period.

All of these considerations support Sheriff Thorp's position that dispatch was a necessary part of Hunt's job. Although this court does not require "blind deference to the employer's stated judgment," it "*does* require granting summary judgment where an employer's judgment as to the essential job functions—evidenced by the employer's words, policies, and practices and taking into account all relevant factors—is 'job-related, uniformly-enforced, and consistent with business necessity.'"[5] *EEOC*, 782 F.3d at 765–66 (emphasis in original) (quoting *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 993 (10th Cir.2001)).

Likewise, the fourth factor—the consequences of not requiring Hunt to dispatch—further confirms that this duty was essential. 29 C.F.R. § 1630.2(n)(3)(iv) (2012). As the district court pointed out, the "LCSO cannot predict when emergencies or critical events will arise, necessitating all on-duty dispatchers to perform dispatch duties" for the safety of the public and law enforcement officers. Dist. Ct. Order, R. 32, PageID 1978. That such emergencies may be infrequent, and all dispatchers are not always needed, does not undermine the LCSO's position. Indeed, this court has consistently held that where a function is "seldom[ly]" required but would be "crucial in an

---

[5] Hunt disputes the LCSO's contention that LEADS work decreased during the pandemic. She thus argues that the LCSO could have moved her back to her original position. Even assuming that the LCSO had this ability, it does not advance Hunt's argument. It is well within the employer's judgment to delegate work as it sees fit. *See EEOC*, 782 F.3d at 762 (explaining that "the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards") (quoting 29 C.F.R. § Pt. 1630(n)).

emergency situation," that function is essential to that position. *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 849–50 (6th Cir. 1998); *see also Hoskins*, 227 F.3d at 727 (holding that function was essential even if it might occur "infrequently" because not requiring an employee to perform the function "could be a serious threat to security"); *Belasco v. Warrensville Heights City Sch. Dist.*, 634 F. App'x 507, 515 (6th Cir. 2015) (affirming that the job function is essential because holding otherwise "would prevent [the employee] from responding appropriately in an emergency"); *Wardia v. Just. & Pub. Safety Cabinet Dep't of Juv. Just.*, 509 F. App'x 527, 530 (6th Cir. 2013) (finding job function essential even if it may have a "low-probability" of occurring because holding otherwise "could have serious consequences for the safety of staff").[6]

Therefore, even if Hunt was seldom required to perform dispatch duties after she transferred positions, the potentially severe consequences of not requiring her to perform dispatch demonstrate that the function was essential.

Furthermore, the fifth factor—the terms of the collective bargaining agreement (CBA)— also supports the LCSO's position. The CBA states that upon return from leave, "the employee is to be returned to the classification formerly occupied, or to a similar classification if the employee's former classification no longer exists." CBA, R. 16-2, PageID 311. Before Hunt took

---

[6] The dissent claims that because "Hunt was never actually asked to dispatch personnel in an emergency" and because "she was able to discharge her duties by call-taking," the fourth factor also weighs in her favor. Dissent at 23. But as discussed above, because dispatching personnel in an emergency is a part of the "bundle of duties" of dispatching, it was not necessary for the LCSO to reiterate that specific component of Hunt's job for it to remain an essential part of her position. Also, that Hunt was able to find another co-worker to dispatch personnel does not change the fact that the requirement to dispatch personnel remained a part of Hunt's duties. Volunteerism from a co-worker could not change the essential functions of Hunt's job. *See Hoskins*, 227 F.3d at 729 (explaining that the "ADA does not require employers to accommodate individuals by shifting an essential job function onto others") and *compare with Dissent* at 24 ("This evidence indicates that the dispatchers who replaced Hunt in doing the work that was essential to her position—data entry—could contribute to dispatching if necessary.").

FMLA leave, the LCSO ordered her to perform dispatch duties and to set aside her LEADS work. Thus, upon her return, it was well within the LCSO's rights, per the CBA, to require her to perform primarily dispatch duties. The CBA also states that employees requesting return from leave "must submit documentation of their ability to perform the material and substantial duties of their classification." *Id.* at PageID 315. Because dispatch was her primary function prior to taking FMLA leave, and was therefore a "material and substantial" duty of her position, the terms of the CBA indicate that Hunt needed to be cleared for dispatch duties to return to work.[7]

Also, keep in mind that nothing in the record demonstrates bad faith on the part of the LCSO. *Cf. Rorrer*, 743 F.3d at 1045 (considering bad faith in the court's analysis and explaining that the record suggests that the city did not act in good faith in trying to accommodate the employee). Prior to and throughout litigation, the LCSO maintained that dispatch is an essential function of the Dispatcher-Data Entry Specialist position. And throughout the pandemic, when Hunt sought support from the LCSO to accommodate her health issues, the LCSO consistently met her needs. For example, when she requested to be moved from third shift because the overnights were impacting her bipolar disorder, the LCSO switched her to second shift. When she was concerned about exposure to COVID because of her suppressed immune system, the LCSO permitted her to use a separate entrance and limited her exposure to co-workers. And finally, when she attempted to return to work after her FMLA leave, the LSCO followed the terms of the CBA and encouraged her to seek extended leave time to heal so she could return to dispatch.

---

[7] The sixth factor of the essential-function inquiry—the work experience of past and current individuals in the Dispatcher-Data Entry Specialist role—is irrelevant to this case. Hunt was the first person to take this role, so there are no former or current individuals who have been in the Dispatcher-Data Entry Specialist position to serve as comparators.

In sum, the LCSO's good-faith judgment, the written job description, the amount of time Hunt spent performing dispatch duties, the consequences of not requiring Hunt to perform dispatch duties, and the CBA all demonstrate that dispatch work is an essential function of the Dispatcher-Data Entry Specialist position such that her requested accommodation is per se unreasonable. Accordingly, we affirm the district court's holding that there is no genuine dispute of material fact that dispatch duties are an essential function of Hunt's position and thus, Hunt, as a matter of law, is not a qualified individual under the ADA.

### 2. Duty to Engage in the Interactive Accommodation Process

The district court was further correct that the duty to engage in the interactive accommodation process was not triggered because Hunt is not a qualified individual under the ADA. Even if an employer does not put sufficient effort into the "interactive process" of finding an accommodation, 29 C.F.R. § 1630.2(o)(3), "that failure is actionable only if it prevents identification of an appropriate accommodation *for a qualified individual*," *EEOC*, 782 F.3d at 766 (emphasis in original) (quoting *Basden v. Prof. Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013)). Because the district court properly held that Hunt is not a qualified individual under the ADA, it also properly held that the LCSO's duty to engage in the interactive accommodation process was not triggered.

### 3. 100% Healed Policy

We also agree with the district court that the LCSO's alleged 100% healed policy does not violate the ADA. Hunt argues that the LCSO's "no light duty" policy constitutes a "'100% healed' policy" that is a per se violation of the ADA. Appellant Br. at 43. However, Hunt also concedes that this court has never granted summary judgment to a plaintiff based on a per se violation of the

ADA regarding a 100% healed policy. Instead, she cites the Seventh and Ninth Circuits for the proposition that a 100% healed policy constitutes a per se violation of the ADA. *See id.* at 49.

In *Henderson v. Ardco, Inc.*, 247 F.3d 645 (6th Cir. 2001), this court explained that an inquiry into an employer's alleged "100% healed policy" is relevant only if the individual qualifies "for protection under the ADA and parallel statutes." *Id.* at 653. Hunt contends that *Henderson* is inapplicable to this case because it predates the 2008 amendments to the ADA. Appellant Br. at 45. But post-2008, this court has not changed course on this issue. *See Beckman v. Wal-Mart Stores, Inc.*, 739 F. App'x 800, 804 (6th Cir. 2018) (explaining that "the question of whether Wal-Mart had a so-called '100% policy' is immaterial" because the employee's requested accommodation eliminated an essential job function and thus the employee was not qualified under the ADA).[8]

## B.     FMLA-Interference Claim

The district court properly held that Hunt's FMLA-interference claim fails as a matter of law because she was unable to perform the essential functions of her job. To establish an FMLA-interference claim, a plaintiff must demonstrate: (1) she is an eligible employee; (2) the defendant is an employer under the statute; (3) she was entitled to leave under the FMLA; (4) she gave notice of her intention to take leave; and (5) the employer denied the FMLA benefits to which she was entitled. *See Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007). An employee

---

[8] Hunt argues for the first time in her reply brief that the LCSO's "100% healed policy" violates the ADA's interference provision. *Compare* Reply Br. at 9 *with* Appellant Br. She asserts that a person's status as a "qualified individual with disability" is not relevant in assessing that person's claim under this provision of the ADA. Reply Br. at 10. But we do not need to consider this argument because arguments not raised in a party's opening brief are waived. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013).

returning from FMLA leave is generally entitled to reinstatement to her previous position or an equivalent position. 29 U.S.C. § 2614(a)(1). However, employees "who remain unable to perform an essential function of their position have no statutory right to restoration under the FMLA." *Edgar v. JAC Prods.*, 443 F.3d 501, 509 (6th Cir. 2006).

Hunt's FMLA-interference claim fails for the same reason her ADA claim fails. That is, because Hunt was not released to perform the essential functions of her position at the end of her FMLA leave (i.e., dispatch duties), the LCSO did not deny Hunt any benefits to which she was otherwise entitled. *See id.* at 511–12; *see also Wheeler v. Jackson Nat'l Life Ins. Co.*, 666 F. App'x 453, 455 (6th Cir. 2016) (holding that the district court properly dismissed plaintiff's FMLA-interference claim because the employee was not performing the essential functions of his job).

## IV.

For the foregoing reasons, we **AFFIRM**.

HELENE N. WHITE, Circuit Judge, dissenting. When Charity Hunt served as the LCSO's Dispatcher-Data Entry Specialist, dispatching emergency personnel was a virtually nonexistent element of her day-to-day duties. Yet, the majority concludes that the ability to dispatch emergency personnel was an essential function of Hunt's position. I disagree with the majority's weighing of the relevant factors and conclude that Hunt has made an adequate showing that she was qualified for her position. Thus, I would reverse the district court's grant of summary judgment to the LCSO.

## I. Qualified Individual

The majority's opinion hinges on its conclusion that dispatching duties were an essential function of Hunt's position. As the majority explains, this determination is based on numerous factors, including the employer's judgment, the job's written description, the amount of time spent performing the function, the consequences of not requiring the individual to perform the function, the terms of the employee's CBA, and the work experience of past and current individuals in the role. 29 C.F.R. § 1630.2(n)(3). After weighing these factors and considering the evidence in the light most favorable to Hunt, I do not agree that the ability to dispatch emergency personnel was an essential function of Hunt's position.

In reviewing the relevant factors, it is important to clarify that "dispatching duties" is a broad term that can be further broken down into several distinct elements: Dispatching emergency personnel, taking calls from the public or other law-enforcement agencies, and operating dispatching equipment. *See* R. 16, PID 242 (An LCSO official saying that the tasks together are "a whole bundle.") Thus, the term "dispatching duties," refers to the entire bundle of duties that compose dispatching. By contrast, the terms "call-taking" and "dispatching emergency personnel" refer to specific duties that are elements of dispatching. Hunt was unable to perform only one

element of dispatching; she could not direct law-enforcement officials to respond to incidents. Hunt could still "call take," which she did on numerous occasions.

First, I do not agree that the LCSO's actions indicate that the ability to dispatch emergency personnel was an essential element of Hunt's position. From the time she was hired until the Covid emergency was declared, the LCSO asked Hunt to perform dispatching duties only four times, and each instance occurred before Hunt's replacement was fully trained.[1] In all but one instance, Hunt performed call-taking functions exclusively. In the final instance, Hunt called a neighboring law-enforcement agency during an emergency to "ke[ep] them in the loop," but she did not actively dispatch any emergency personnel.[2] R. 17-6, PID 1723. Hunt was also asked to perform dispatching duties after the Covid emergency began, but the LCSO made clear on several occasions that the placement was only temporary and was not her permanent position. *See, e.g.*, R. 21, PID 971 ("[T]his assignment is temporary."); R. 21, PID 978 ("[T]he overall plan was to return [Hunt] to the data entry role[.]"). Even then, she performed only the call-taking function.

The majority points out that the LCSO refused to allow Hunt to return to work after her FMLA leave unless she could perform all the dispatching duties, which suggests that they were all essential functions of the position. However, LCSO officials repeatedly testified that they made no distinction between essential and non-essential functions of Hunt's position. *See, e.g.*, R. 19, PID 800-01 (requiring Hunt to be "competent to complete *all* duties of your position without

---

[1] When referring to "dispatching duties," I am again referencing the entire bundle of tasks associated with dispatching rather than the specific task of dispatching emergency personnel.

[2] It is unclear whether relaying information to other law-enforcement agencies was among the dispatching duties that Hunt could not perform due to her disability. Because at this stage we must consider the evidence in the light most favorable to Hunt, a reasonable jury could conclude that Hunt's disability prevented her from actively dispatching emergency personnel, but that she was still able to relay information to other law-enforcement agencies. *See* R. 16-5, PID 323 (describing that Hunt was concerned about "putting the lives of the officers in her hands").

restrictions" (emphasis added)); R. 16, PID 233 (testifying that an individual had never been allowed to return to work with a restriction).  Thus, it appears that the LSCO prohibited Hunt from returning to work without regard to whether dispatching emergency personnel was an essential or non-essential function of her position.[3]  When considering the evidence in the light most favorable to Hunt, it is not clear that the LCSO viewed the ability to dispatch emergency personnel as an essential function of her position.

Hunt's written job description is similarly ambiguous.  Although the majority is correct that Hunt's job description listed dispatching duties, it is not clear from the description which duties were essential to her position.   Instead, the description stated that the position's "primary responsibility is all LEADS entries, modifications, validations, and removals."  R. 16-3, PID 321.  If LEADS entries comprised the "primary" duty of the position, then reading the job description in Hunt's favor would suggest that the other duties are ancillary to the position.  Moreover, Hunt was able to perform certain elements of dispatching.  The job description states that dispatching involves "answering incoming phone calls, operating radio console and peripheral electronic equipment to relay information concerning law enforcement and other emergency information." *Id.*  Hunt was able to take calls and operate equipment—she was limited only in her ability to dispatch emergency personnel.  Accordingly, this second factor too does not clearly favor the LCSO.

Third, we consider the amount of time Hunt spent performing the function.  From the entire record, it appears that Hunt placed a call to another law-enforcement agency only once and never

---

[3] The majority's reasoning creates a significant loophole.  As long as an employer is never willing to consider an accommodation for an employee, the employer can argue that any function is essential to the job.

directed personnel to respond to an incident.[4]  At all other times, Hunt's "dispatching" duties encompassed only call-taking, a task she was able to perform with her disability.  The majority minimizes this point, arguing that Hunt switched duties with other dispatchers on her own, rather than at the employer's direction.  But in determining whether a function is essential, we must examine "the actual functioning and circumstances of the particular enterprise involved."  *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988).  Here, other than a single call made to another law-enforcement agency, Hunt was never directly asked by the LCSO to place a call to emergency personnel, let alone to dispatch individuals in an emergency.  Nor is there evidence that the LCSO ever reprimanded Hunt for performing exclusively call-taking functions.  Thus, this factor weighs in Hunt's favor.

Fourth, we consider the consequences of not requiring Hunt to dispatch.  The majority concludes that even if Hunt performs dispatching duties "seldom[ly]," her participation would be "crucial in an emergency situation."  Maj. op. 15–16 (quoting *Brockers v. Cleveland Bd. Of Educ.*, 145 F.3d 846, 849–50 (6th Cir. 1998)).  However, several facts weigh in favor of the opposite conclusion.  Hunt was never actually asked to dispatch personnel in an emergency; she was able to discharge her duties by call-taking.[5]  When a natural disaster hit the area—severe flooding—

---

[4] Hunt called a neighboring law-enforcement agency to "let them know what was coming their way and ke[ep] them in the loop."  R. 17-6, PID 1723.

[5] The majority minimizes this fact by arguing that Hunt switched duties with co-workers on her own initiative and that the "ADA does not require employers to accommodate individuals by shifting an essential job function onto others."  Maj. op. 15 n.6 (quoting *Hoskins v. Oakland Cnty Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000).  But this puts the cart before the horse.  The first step of our analysis requires us to determine whether a duty is essential.  *See id.* at 728.  Only then can we examine whether a particular accommodation is reasonable.  *Id.*  We cannot preemptively *assume* that a duty is essential to help decide whether a factor weighs in Hunt's favor or not.

Hunt was not asked to dispatch personnel even though she was at work. Moreover, it appears that Hunt's shift was already fully staffed without her.[6]

Further, although the LCSO asserts that there was limited data-entry work to do during the pandemic, there is significant evidence supporting that the data-entry workload barely changed. LEADS statistics indicated that there was only a very slight decrease in warrants and protection orders during the pandemic, and an LCSO official told a local newspaper that there had been "about the same amount of field arrests and warrants between March and May in 2019 and 2020."[7] R. 23-4, PID 1322. Thus, there was a continuing need for data entry. Hunt personally witnessed files being brought into the office for data entry. And on several occasions, Hunt saw dispatchers from the first shift doing data entry instead of dispatch work. Even the reason the LCSO gave for moving Hunt off data-entry work—that the courts were closed—was no longer applicable by the time Hunt sought to return from FMLA leave—the county's courts were operational by July 28. This evidence indicates that the dispatchers who replaced Hunt in doing the work that was essential to her position—data entry—could contribute to dispatching if necessary.[8] When considering the

---

[6] The LCSO needs twenty-four dispatchers, eight each for the morning, afternoon, and night shifts, to be fully staffed for a seven-day work week. Dispatchers work five days per week, and the LCSO needs a minimum of four dispatchers working on any given shift. When Hunt went on FMLA leave in May 2020, her shift was already fully staffed with eight dispatchers—*not* including her. Only the third shift was shorthanded at the time.

[7] Specifically, Hunt asserts that from January 1, 2020, to February 28, 2020, the LCSO was entering an average of 5.5 warrants per day and 1.6 protective orders, and that only decreased to 5.3 warrants per day and 1.5 protective orders from April 15, 2020, through August 3, 2020.

[8] Hunt was originally assigned to work the first shift but was moved to other shifts—the third and then the second—during the Covid emergency. The LCSO never moved Hunt back to her original shift, and the individuals who took over Hunt's data-entry duties worked the first shift. If an additional dispatcher was needed during the second shift, the LCSO could theoretically swap Hunt with an individual that took over her data entry duties, returning Hunt to her original shift. But that appears to have been unnecessary because both the first and second shifts were fully staffed, even without Hunt.

-24-

facts in Hunt's favor, this factor also suggests that dispatching emergency personnel was not an essential element of Hunt's position.[9]

In sum, a reasonable jury considering the facts in the light most favorable to Hunt could conclude that the ability to dispatch emergency personnel in addition to performing call-taking responsibilities was not an essential function of Hunt's position. Thus, the district court erred in concluding that Hunt was not a qualified individual for her position as a matter of law under the ADA and FMLA.

## II. Interactive-Accommodation Process

To begin the ADA process, an employee must inform the employer of the employee's disability and the limitations arising from it, and request an accommodation. *Gantt v. Wilson Sporting Goods Co*., 143 F.3d 1042, 1046 (6th Cir. 1998). "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation." *Id*. (quoting 29 C.F.R. pt. 1630 App. § 1630.9). This involves a "mandatory" and "interactive process" where both parties engage in good faith to identify a reasonable accommodation that could overcome an employee's limitation. *See Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch*., 974 F.3d 652, 669 (6th Cir. 2020).

---

[9] I do not believe the last two factors have a bearing on this case. As the majority points out, Hunt is the only individual who has ever worked under the "Dispatcher-Data Entry Specialist" role. Thus, there are no past or current incumbents of the role. And unlike the majority, I do not believe the CBA has any bearing here. The CBA states that when an employee returns from leave, they are to return "to the classification formerly occupied, or to a similar classification if the employee's former classification no longer exists." R. 16-2, PID 311. This provision says nothing about the essential functions of Hunt's position; it only says that Hunt has a right to continue in the same classification when she returns from leave as when she left.

The LCSO argues that (1) Hunt never explicitly asked for an accommodation under the ADA and (2) her work restriction is not actually a disability. However, an "employee is not required to use magic words such as 'accommodation' and 'disability'; rather, we ask whether 'a factfinder could infer that [the interaction] constituted a request for an accommodation.'" *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020) (alterations in original) (quoting *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)). Here, Hunt informed the LCSO of her disability in several ways—including through emails and her doctor's note. Calling her limitations a "work restriction" instead of a disability is a mischaracterization. The LCSO knew that Hunt suffered from anxiety and bipolar disorder and knew her limitations were caused by those conditions, yet it refused to work with Hunt on an accommodation—even after Hunt's doctor approved her to perform call-taking duties. Thus, I believe that a reasonable jury could conclude that the LCSO failed to fulfill its duty to engage in an interactive accommodation process with Hunt.

### III. 100%-Healed Policy

A "100%-healed" policy exists where an employer assumes that all duties of a position are essential, finds all work restrictions disqualifying, and refuses to conduct individualized assessments regarding an employee's ability to perform essential functions. *See Henderson v. Ardco, Inc.*, 247 F.3d 645, 653 (6th Cir. 2001). Our case law suggests that when an employee otherwise qualifies for protection, a 100%-healed policy constitutes a violation of the ADA. *See id.*

Hunt alleges such a policy existed at the LCSO based on, among other things, (1) a longtime supervisor's testimony that she had never seen an accommodation at the LCSO before, (2) the department's FMLA administrator's testimony that she had never handled a situation where an accommodation was made, (3) the LCSO's having a "no light duty" policy, R. 19, PID 751, (4)

the LCSO's refusal to even consider an accommodation, and (5) several individuals telling Hunt that she could only come back when she was able to complete "all duties," R. 18, PID 700.

The LCSO does not really dispute that such a policy would violate the ADA. Rather, the LCSO argues that a 100%-healed policy did not exist within its department. When considering the facts in the light most favorable to Hunt, a jury could find that a 100%-healed policy did in fact exist in the department. Consequently, summary judgment was inappropriate.

## IV. FMLA-Interference Claim

The parties only dispute the last element of Hunt's FMLA-interference claim: Whether the LCSO denied Hunt the FMLA benefits to which she was entitled. This element hinges on whether Hunt was a qualified individual for her position. Because a reasonable jury could conclude that Hunt was qualified for her position, I would reverse the grant of summary judgment on Hunt's FMLA-interference claim.

## V. Conclusion

After weighing the relevant factors and considering the evidence in the light most favorable to Hunt, a reasonable jury could conclude that Hunt was qualified for her position and was denied a reasonable accommodation. Accordingly, I dissent.